Case number 12-1011 at L. Raymond Interior Systems, Inc, Petitioner v. National Labor Relations Board. Mr. Bowles for Petitioner, Raymond Interior Systems. Ms. Mazarin for Petitioner, Southwest Regional Council of Carpenters. Mr. Lario for Respondent. Good morning. Let's let everybody get out of the courtroom first. Pardon me? Let's let everyone get out of the courtroom first. Mr. Bowles, everyone was polite enough not to correct me that I had my fact situation reversed. This is the case with the coerced activity nine years ago. Correct. So can you bring us up to date? Yes. Again, I'm James Bowles on behalf of Petitioner, Raymond Interior Systems. Raymond continues to have a collective bargaining agreement with the carpenters, although it's been ordered by the NLRB to rescind that agreement. And that's the principal point I want to make in the argument today, is that the board erred in requiring the rescission of a preexisting collective bargaining agreement between Raymond and the carpenters. Raymond is a construction industry employer, and obviously the carpenters are construction industry union. And they're allowed under Section 8F of the National Labor Relations Act, which this court is aware of from NOVA plumbing and other decisions, to have pre-hire agreements. And Raymond and the carpenters entered into a pre-hire agreement covering the drywall finishers employees, this group of employees upon the termination of the painters agreement that covered these employees. So as of October 1, 2006, Raymond had a preexisting collective bargaining agreement with the carpenters covering the drywall finishers. Did you say this case went back to the board again after that? Yes, it did. And the board at that time, again, refused to rule on our request that they address this issue. So twice they've refused to address the validity of that Section 8F contract. How did they rescind? That's our question, is how can they rescind? Well, where is that case? Has that been appealed to? This is curious. No, we appeal both cases. Both cases. And they're both in our petition for review in this court. Okay. I thought something else occurred. Pardon me? When you say both cases, you mean the motion for reconsideration? Yes, yes. Right, okay. Well, I don't see how – I mean, they didn't refuse to. They said it's irrelevant. Correct. They don't need to. And the reason is that even if you had the 8F agreement on October 1st, even if the board said that, you tried to convert it into a 9A the next day. Correct. And if – when that was foiled, and your position is, well, then at least this survives, that is, it revives the 8F, why couldn't the board say what it did in that footnote saying, you're free to negotiate an 8F with the Carpenters or any other union? Because they ordered us, though, to rescind the existing 8F agreement, and that's contrary to the board's precedent. What they said is we should cease and desist from entering into – Okay, we're in the order from the motion for reconsideration. When you read it together with footnote 5, or even when you don't – well, I think you have to read it together with footnote 5. Does the board say, okay, we will withdraw and withhold all recognition from Carpenters, local unions, so on and so forth, of our drywall finishing employees, unless you get the certification. But then you look at footnote 5, it says, contrary to Raymond's contention, the board's order should not be interpreted as requiring a board certification, etc., before Raymond can lawfully recognize the Carpenters or any other union as an 8F. Right, but it's unclear from that whether or not our preexisting 8F agreement was still in effect. Well, what if it was, and what if it wasn't? Well, because – You could do it right now, or you could have done it on December 31st. Correct, we could have, but then there would be liability to the Carpenters for the union security clause, because the preexisting 8F agreement was not in effect from the board's decision going back to October 1 of 2006. Yeah, under Luke and Zidelle, the amount of money that would be owed is reduced under your theory. Correct. Yes. Correct, and yes – In other words, the remedy, and the board has specifically said – Absolutely. The remedy would be cut short. And that's our primary argument here, is that they didn't follow Luke and Zidelle, their own precedent, and they can't depart from their own precedent without an explanation. I don't know how they say it's not relevant. That's perplexing. That's perplexing to us, and we asked in reconsideration, please, address this issue, and they refused to address the issue. They addressed the issue on an ongoing forward basis, saying that under 8F we can enter into a new agreement, but they didn't address the validity of the original agreement. The simple point you're trying to make is, if we have an existing 8F and it is valid, and you think under board law it should be valid because the subsequent ULP does not initiate the prior 8F – Correct. Then our – whatever money is due is substantially different than the theory adopted by the board. That is correct. And the reason is because it contravenes the statute, their decision. It contravenes their prior precedent. It has grave due process concerns because what they're saying is that the Carpenters has to repay the union security dues, even though the unfair labor practice was committed by Raymond by supposedly saying the wrong thing at the October 2 meeting and trying to convert to a 9A agreement. And in Zydell itself, the board said we're not going to punish the union for what the employer did or vice versa. That would raise grave constitutional concerns is what they said in Zydell. Yeah, but you had the misconduct of both parties, the board found. No, that's not correct. The fact is there was – the ALJ found that there was no violation by the Carpenters in any statement that was coerced or told people improper information. Well, you have the Beck violation. That's a separate violation, but that's not a basis to rescind an 8F agreement because it occurred later. And so, again, and also the NLRA is not supposed to be punitive. They're not supposed to order these orders for basis of penalizing. They're supposed to make whole, and if we made whole and go back to October 1, the 8F agreement would be in place. If there had been no coercion finding, what type of agreement would you have had on October 2? You would have had a 9A, right? Correct. After the conversion, there would have been a 9A after the signing of the agreement and the presentation of the authorization cards. Your challenge to the unfair labor practice is it occurred subsequently. That's all. Your argument is not supported by substantial evidence, right? Correct, Your Honor, for two reasons. One is – Go ahead. I understand that it's very rare for credibility resolutions to be overturned by this court. Not only rare, I actually couldn't find a case where we've done that. I understand that, but there are cases that say that if they're patently unreasonable – Do you know of a case where we've actually used the standard, hopelessly incredible standard, where we found that? No, I do not, Your Honor, but Stevens Media does hold that if they're patently incredible and contradictory, if you're ever going to do it, this would be the case. And why is that? What's your best argument? Well, the best reason is that the administrative law judge relied on Jose Ramos, who did not speak English, did not use the translation headphones, could not give the English version. Therefore, he lacked personal knowledge. Well, let me ask you about that. I saw that in your brief about Ramos. You tried this case before the ALJ, right? Yes, I did. So, at Joint Appendix 475, you asked Ramos if he listened through an interpreter, and he said yes, right? And then, in 477, twice more, you referred to him as using an interpreter. Your Honor, I don't have that cite in front of me, but I believe – I just read them to you. I believe that – But in your brief, you say he testified without an interpreter. He said he did not use the headphones. I just don't – what? Isn't that the same as he testified without an interpreter? Correct. So, do you stand by this statement in your brief? Yes. So, how do you explain the portions of the record I cited? Well, it's possible that he said two different things. He was contradictory. Where was he contradictory? He said at one point that he did not use the headphones. Oh, okay. But beyond that is even he said – And the – okay, so here – I'm just looking for this. He says – okay, so there were three witnesses. The ALJ found Wienzer to be, quote, disingenuous. And what's his name, Zaharo? Yes, but – But he found that the witnesses, Gordon Hubble, David Cordero, and Pedro Lora, who corroborated him, were credible. And he also found that the painter's witness, Richard Myers, who said there were no unlawful statements, was also honest. So he says that four different people who were honest and didn't hear it are credible and honest, and yet he doesn't credit them. And he credits Ramos, who, at least when the general counsel asked him the question, said they could continue to work but need to sign with the carpenters. Not an unlawful statement. It was only later when the painters examined him that he said, oh, it has to be that day. And then later on, cross-examination, he said it has to be this day. So his testimony changes each time that he's asked the question. And in the ALJ discredits four witnesses that he finds to be honest. And even Ruben Alvarez, the other painter's witness, said there were no unlawful statements by Wienzer. He said the unlawful statements were by Zaharo. So I'm just saying, if you were ever going to overturn a credibility issue, this would be the one. But there's one other thing, and that is that the statements were about the signing of union membership cards. You have to sign with the union today for your union membership, supposedly. There was not one scintilla of evidence that that statement influenced employees to sign union authorization cards, which are a different animal. That has to do with union representation, not union membership. And we cited the cases holding that. And therefore, there was not any substantial evidence. There was no scintilla of evidence that anybody was influenced by these statements to sign an authorization card. Mr. Bowles, I'm going to ask the other attorneys as well. Are you aware of any cases, I can't find any, in which the union in the position of the painters seem to be in a grieved party when they're seeking alternate benefits? I'm not aware, Your Honor. I'm really perplexed about that. I'll ask the board attorney as well. Because my understanding is, even though they filed a charge, the board's complaint is what carries the day. That's correct. And I can't comprehend how the painters can be in a grieved party if all they're seeking is alternative benefits. I agree with that. Okay. I'll ask the other court. Thank you. May it please the court. My name is Yulia Mirzoyan of DiCarlo and Shanley, representing the petitioner cross-respondent, the Southwest Regional Council of Carpenters. The union is, the carpenters' union is in agreement with everything that Mr. Bowles has just said. That's applicable to both the carpenters and the employers. So I'm just going to address the Beck issue. And the law regarding the Beck and General Motors notice is clear that the notice may be given either before or concurrently with the time that the union is seeking to oblige the employees to become members and to pay the full dues, including the non-representational expenditures. And the dispute here primarily seems to be about what constitutes concurrent notice. And the board is taking the position that there was no concurrent notice because the January-March 2006 issue of the Carpenter Magazine, which contained the Beck notice, was handed out to the employees after they had returned the completed membership application. But it's very relevant here that the handing out of the membership application and the Carpenter Magazine, it all happened at the same meeting, the October 2, 2006 meeting. And the relevance of that is that the point of the Beck notice is to make sure that the decision to become members and to pay the non-representational expenditures was voluntary, that it was not coerced. And some of the facts that show that there was no coercion, which I'd like to highlight, was that the Beck notice and the magazine, it even contains the sentence that workers cannot lawfully be required to actually join a union as a condition of employment. And the magazine and the membership applications, they were handed out by the same individuals, Margaret Armenta, who was a Spanish speaker, and Melinda Arlene Carlton. So after reviewing the magazine, the employees could have come back to this very same table and asked to withdraw the membership application. In addition, they could have gone home to review the magazine because no dues were actually collected that day, so they had a further chance to review the Beck notice and see what they thought about it. So in this context, there was no coercion, and the facts are very different from California saw, where the new hires, they were just given the membership applications and the dues checkoff form without further action whatsoever. Thank you. All right. Mr. Lauro. Good morning, Your Honor. Good morning. May it please the Court? Are you aware of any case just preliminarily? Excuse me, Your Honor? Are you aware of any case situation in which a union in the painter situation is seen to be an agreed point? Based on the denial of the alternative benefits remedy, I'm not aware off the top of my head of one, and as you know, the painter's issues were submitted to the Court on the briefs. So the answer to your question is no, I'm not aware of one off the top of my head. I mean, it's a curious situation because I can't understand. They appear in the situation to be no different than anyone walking down the street and saying, we just noticed the situation. They had no rights. They were lawfully removed from bargaining rights. Someone on the street says, we noticed a strange situation, and we think the charge should be filed and a complaint issued. And I can't for the life of me understand why they're in a Greens party. And I just wondered if you need one of your – none of you raised it, which is perplexing to me. And their statement of standing doesn't say anything. It just says they didn't get something they wanted. Well, that doesn't give you standing. There are lots of people out there who could come to court and say, I'd like something, and if you deny it to me, I have standing. That's not the way it works. I – none of you addressed it. I don't understand it. I looked for the alternate benefit cases. I couldn't find a union in this situation. It would seem to be agreed, and I just wondered if any of you had. That's all. No, I'm not aware of any such case, and I'm not in a position to make the painter's argument for them at this time, Your Honor. I understand. We can research. But anyway, Your Honor, turning to the issues before the court, one thing we need to look at, and Your Honor's addressed this morning, is that the accredited testimony supports the board's findings of the violations on October 2nd of the year in question, and one key thing here was the unlawful assistance. Now, my opponent, acknowledging that they have a very heavy burden to meet to show that the underlying credibility findings were hopelessly incredible, tries their best, but I would submit that not only is that violation based on undisputed legal principles, no one is denying that if you make the statements found, that employees have to sign up with the union that day in derogation of their statutory and contractual grace period, that that constitutes unlawful assistance. The question is, did the judge make a mistake in believing the witnesses he chose to believe, and does my opponent meet the heavy burden of showing that decision was inherently incredible? They clearly did not. As Your Honor's noted, these are demeanor-based findings. They found that one witness, Mr. Windsor, testified disingenuously, contradicted himself on key points. It was also noted that the other witnesses the company would like to rely on, Mr. Zerrero, Mr. Hubel from the union, also contradicted Mr. Windsor on key points. But in any event, at the end of the day, this is a solid demeanor-based finding, as is the decision to credit the testimony of three employees that they heard the unlawful statements sign today or no work. Mr. Lora, let's get to the serious issue, at least from my perspective in this case. We understand your credibility arguments. The Board says it doesn't have to determine whether there was a valid 8K. I mean, when I read the briefs and as I listened to your arguments, I don't understand it. Obviously, there was an important reason why you decided it. It affects the remedy, assuming you're right, and everything else. Well, Your Honor, as the Board explained, it was immaterial whether they had a prior. It's not immaterial under existing case law. It's absolutely not immaterial. I've got the cases right in front of me. I just looked at them again. If there's a valid pre-existing, pre-hire agreement, that affects the remedy, and that's what the Board law is. They did not distinguish that case law. They didn't even address it. Well, two things, Your Honor. One— And Zidell can't—you can try and distinguish Zidell. You can't distinguish Luke. And there are some Court of Appeals cases that have said the same thing. If you have a pre-existing valid agreement, a subsequent ULP doesn't vitiate that prior agreement. Yes, Your Honor. A couple points in answering your question. One is that I do stand by the Board's point that its focus in the remedy is undoing and addressing the unlawful assistance, 9A recognition, and application of that collective bargaining agreement and its union security clause to the employees. And it is true as to that, the fact you had a prior 8F agreement would not change those violations or the need to remedy them. Now, when remedying those violations, which, again, I want to be specific, it includes that as a result of the unlawful recognition and support and assistance, you then apply that 2006 carpenters agreement and its union security clause unlawfully to these employees, and that needs to be undone. Now, a couple things there. One thing my opponent suggests, and I'm not sure they have a limiting principle there, is why can't we just go back to that exact same 2006 agreement or its equivalent? It doesn't make sense. That was part of the violation, and those violations and the coercive impact have not been done. Now, as to Zidell and Luke, they're clearly distinguishable, as we pointed in our brief, and the Court is very specific. The limiting principle there was that you did not want to impose vicarious liability on an innocent union where there wasn't evidence. Except Zidell. There's no such incident. There's no such fact situation in Luke. And there are a couple of court of appeals cases, same thing. Well, that's not the distinguishing consideration. That's not a relevant consideration. In Luke, first of all, I don't think Luke is clearly on all fours here, where you have a union, the Carpenters, who participated in, was aware of, and committed its own violations. The Carpenters accepted unlawful assistance, and the Board found that violated the Act. The Carpenters accepted the unlawful recognition, and the Board found that violated the Act. The Carpenters applied its agreement to employees in the union security clause. The Board found that violated the Act, and they committed their own Beck violation. That's not on all fours with Luke. And another thing in Luke that's not on all fours here, as Your Honor can see looking at the case, there the employer took voluntary steps to remedy its violations. That's another distinguishing factor. We don't have those circumstances here. And the Board has explained all of this in its opinion. The Board explained why the existence of a valid prior aid act is not germane, and what I just said supports that finding. It would not make a difference. It would not be outcome determinative, because you would still have the violations on October. What do you think the Board said as opposed to what you surmised? What do you think the Board said that we would be looking at that powerfully disposes of the prior precedent, including some of the Court of Appeals' opinions? Well, Your Honor, I think the Court would be looking at, for example, the fact that the cases relied on by my opponent are distinguishable. This is not a situation. Now, what did the Board say in its opinion to make that clear? Your Honor, I recognize as you did what the Board said. It simply said we find that the existence of a prior aid act would not change the result here. That's what I thought. So they didn't say anything. Your Honor, I have the same opinion you do. It is not our responsibility to try and fill in what an agency meant to say, because now we're running into the problem where your view of the precedent is different from my view of the precedent, and in truth the answer is the Board is supposed to tell us what they think the precedent means. I just wanted to confirm. Was it missing something when you were telling me the Board didn't say anything? No, Your Honor. With due respect, I think it's clear that cases like Tadell and Luke are distinguishable for the reasons I mentioned. I would say back to you, due respect, it's not clear to me. Okay, I understand. But let me try something else. If it's not clear to us, if my panel members agree, it has to go back to the Board, right? I don't know that it does, Your Honor. You agree that the remedy is going to be different depending on which way you construe it, right? If you follow the approach in Tadell and Luke and the other cases that I'm looking at, the remedy is different, right? I don't concede that a prior lawful 8F would change the remedy here, because the remedy is you still have to cease the unlawful recognition and the application of that contract. Something with all due respect, Your Honor, we haven't fully addressed this morning, is you have to ask my opponent, when you say you want a prior 8F, what do you mean exactly? What they mean is we want that same 2006 agreement, the one the Board specifically said we can't apply because it's part of your violations on October 2nd, after the unlawful assessment. What you're saying is what the cases appear to say you can't say. You vitiated the prior lawful agreement pursuant to a subsequent ULP. That's the principle emanating from the precedent saying you can't do that. And the Board hasn't explained why that's different. And you self-servingly say, well, they can't say what they're saying because that agreement's no good, and I'm asking you how can you reach that conclusion under existing precedent? You can't vitiate a preexisting lawful agreement is what the precedent says. The precedent says that in very distinguishable terms. I know we're going around in circles there. We're not going around in circles. We're right on a straight road. The point is the Board hasn't answered the question. They haven't explained. You can't summarily say we're vitiating the agreement, but we're not going to decide it. That makes no sense. Your Honor, the point is that given that the Board's order specifically says you cannot apply that agreement and then my opponent simply says, yes, we can, but their argument is contrary to basic remedial principles. We have these unremedied coercive acts against the employees. They're still there. The employer basically says let me just apply the same terms, the same union security clause we unlawfully applied, slap an ADEF sticker on it, and then just do that same thing to employees. I submit that doesn't make sense. It's contrary to the need to undo the impact of the violations found on October 2nd. Well, that's a good first draft of a Board opinion. It might be interesting to hear what they say. Your Honor, with all due respect, I think I'm just elucidating basic remedial principles that the Board cited in saying we're applying the traditional judicially approved remedy for these kinds of violations, the unlawful assistance and recognition and application of this contract, the same contract they want to go ahead and apply anyway, even though the Board's order tells them not to, and for good reason. What would be the impact of allowing them to go back to that exact same contract when they can't apply it because it's been coercively done? These employees have already been coerced in their choice whether to join the union or not. In underrated athletes, they'll have a choice. Do I stay or do I go? Do I sign up or do I go elsewhere? And they've already been coerced into doing that in derogation of their statutory and contractual grace period. Now, Your Honor, I see I'm running out of time, and I appreciate your questions. I think the Board's order is well-founded, and my opponent's desire to go back to the exact same agreement is not, but I just want to discuss quickly the Beck violation and point out that I agree with my opponent about one thing. To be timely, the notice has to be given concurrently. It's essentially conceded that didn't happen here because at the time, the carpenters distributed those membership forms and other forms in a membership form that says and it refers to your obligation to pay dues at that moment. That's an attempt to obligate employees to pay dues, and it's admitted that only after employees signed those forms and handed them in were they given any Beck notice at all, and that's against the policy, which says the notice must be concurrent, must be at that time. Otherwise, employees might be misled to believe that contrary to their Beck rights, they have to be full members and pay full dues. And so, again, I appreciate our back and forth. I think the Board's remedy and decision is within its discretion, and unless the Court has further questions, I thank it for its time. All right. Thank you. Does Mr. Bowles have any time? Why don't you take a minute? Yes, Your Honor. Counsel's last point on the 8F issue doesn't make sense. If the Board, in its footnote 5 on the reconsideration motion, says that Raymond may lawfully enter into a new 8F agreement at any time, then what would be the point of rescinding the old 8F agreement if we could have entered into a new 8F agreement at any time? So that would be an unreasonable remedy and contrary, again, to the Board's own decisions. Your underlying argument, I want to make sure I have it right, is if the Board is right on everything else, the employees were coerced on dues and membership, not on the contract. Correct. I mean, I don't understand. I have to look it up again. I don't understand his argument at all. I don't know what it means to be coerced on a preexisting contract if its lawful is there, but they arguably were coerced with respect to dues payment and membership if the Board's right on the rest. That's what they said, yes. And you're saying it makes a big difference because the remedy is different. Correct. And, Your Honor, it's page 457 of the transcript, JA457, is where he says, did you listen to Travis Windsor in English? And he says yes. Mr. Rogers, thank you. All right, and can you tell me again where the Board rescinds this F8 agreement in its order? In the remedy itself, in its statement that shall... Until it gets a certification. Pardon me? Is that the language, until it gets a certification? Yes, correct. Okay, and that's not 8F. Right. That's not 8F. Correct, but it also says in cease and desist from 1B on page JA043, it says maintaining and enforcing or giving in effect to the Carpenters Union 206-2010 Master Collective Bargaining Agreement. The 8F agreement. That's what I believe. And I agree with you that it's a little bit unclear from the order, but appellate counsel, and when we talked to the Board region, they said they were taking the position that it required rescission of our preexisting 8F agreement, and therefore, for that reason, we needed to appeal this. You're pointing to A1B, JA457. Correct, yes. Thank you.
judges: Henderson, Tatel, Edwards